**Karyn T. JONES and Chris Jones, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civil No. 93–20137 SW.**

United States District Court,
N.D. California.

July 3, 1996.

Donald J. Loftus, Monterey, CA, for plaintiffs.

Patricia J. Kenney, San Francisco, CA, for defendant.

## MEMORANDUM OF DECISION

SPENCER WILLIAMS, District Judge.

Plaintiffs Chris and Karyn Jones brought this wrongful birth action against Defendant United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, to recover costs and damages associated with the birth and upbringing of their daughter Abbigayle. According to Plaintiffs, the United States is responsible for Karyn's pregnancy because U.S. Army doctors negligently failed to warn Karyn that the penicillin they prescribed for her could interfere with the effectiveness of her birth control pills.

The Court bifurcated the case and conducted a two-week bench trial on the issue of liability. After considering the entire record, the Court finds that Plaintiffs' evidence of causation does not meet the *Daubert* standard for admissibility in federal court. Furthermore, even if this evidence were admissible, the Court finds that Plaintiffs' have failed to satisfy their burden of proof on several elements of their case. This memorandum constitutes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## FACTS

In early 1992,[1] at the time of the events leading to this lawsuit, Karyn and Chris Jones were married and living together at Fort Ord, California. Chris was an active-duty sergeant in the U.S. Army. Trial Transcript ("Tr."), vol. 1, at 22, 27.

On January 16, Karyn went to an Army gynecologist, Dr. James Murphy, M.D., for an annual examination and to obtain a prescription for birth control pills. Dr. Murphy conducted a pap smear which showed that Karyn was not pregnant. Dr. Murphy also prescribed Triphasil–28 birth control pills, but he did not warn Karyn of the possibility that antibiotics could interfere with the effectiveness of her birth control pills. Tr., vol. 1, at 23.

Karyn began taking her birth control pills on February 2. Tr., vol. 1, at 24. During this time, Karyn and her husband had sexual intercourse an average of once per night. Tr., vol. 1, at 34.

On February 7, Karyn went to the Army dental clinic at Fort Ord complaining of a toothache. The dental clinic referred Karyn to the oral surgery unit at Silas B. Hayes Hospital, where oral surgeon Dr. Mark Cerbus, D.D.S. examined Karyn and determined that she needed oral surgery. To assure that no infection would be present at the time of surgery, Dr. Cerbus prescribed Penicillin–VK, an antibiotic, to be taken four times a day for six days. Karyn's medical chart indicated that she was taking birth control pills, but neither Dr. Cerbus nor his dental hygienist Susan Balistreri warned Karyn that the Penicillin–VK might interfere with the effectiveness of her birth control pills. Tr., vol, 1, at 27–30.

Karyn took four antibiotics pills per day on February 8 and 9, three pills per day on February 10 and 11, two pills on February 12 and one pill on February 13. Tr., vol. 1, at 32–33.

On February 19, Karyn returned to the dental clinic to have some lab work done in preparation for surgery, including a routine pregnancy test. She saw another oral surgeon, Dr. Caples, during this visit. Dr. Caples warned Karyn that antibiotics could reduce the effectiveness of her birth control pills. Tr., vol. 1, at 53–54.

The next day, Karyn was informed that her pregnancy test was positive. A second

---

1. Unless otherwise stated, all dates in this Order refer to 1992.

pregnancy test performed on February 21 was also positive. Tr., vol. 1, at 54–55.

After discovering that she was pregnant, Karyn discussed her options with her husband. Although neither Chris or Karyn wanted more children, and Karyn had had an abortion on a prior occasion, the Jones decided to continue Karyn's pregnancy to term. Tr., vol. 1, at 56–57, 101–102.

Karyn gave birth to Abbigayle, a healthy baby girl, on October 17. Tr., vol. 1, at 57. Since her birth, Abbigayle has had no significant health problems and has lived primarily with her grandparents in Mississippi. Abbigayle has only sporadic contact with her biological parents.

On August 11, Plaintiffs filed a Standard Form 95 administrative claim against their Army doctors for malpractice and wrongful life. The Army denied Plaintiffs' administrative claim on April 22, 1993. Plaintiffs thereafter filed this suit in federal court.

### ANALYSIS

The Court bifurcated this case for purposes of trial. The sole issue in the first phase of the case is liability: whether the United States is liable for the costs attributable to Karyn's pregnancy and raising Abbigayle.

I. *Admissibility of Plaintiffs' Scientific Evidence Under Daubert*

As a threshold matter, the Court must determine whether Plaintiffs' scientific evidence regarding the supposed interaction between antibiotics and oral contraceptives satisfies the standard developed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and explained further upon remand by the Ninth Circuit in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). Under the *Daubert* standard, medical evidence is admissible in federal court only if it both: (1) reflects "scientific knowledge"; and (2) is "relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2798; *Daubert,* 43 F.3d at 1315.

A. *Scientific Knowledge*

To qualify as scientific knowledge, an inference or assertion does not have to be proven as an "absolute certainty," but it must be "derived by the scientific method" and "based on scientifically valid principles." *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795; *Daubert,* 43 F.3d at 1316. Factors that may be relevant in determining whether evidence is based on scientific knowledge are: (1) whether the theory employed by the expert is generally accepted in the scientific community; (2) whether it has been subjected to peer review and publication; (3) whether it can be and has been tested; and (4) whether the known or potential rate of error is acceptable. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97; *Daubert,* 43 F.3d at 1316–17.

Testimony that grows naturally out of an expert's own independent research is generally more reliable than opinions an expert has developed for the sole purpose of testifying in court. *Daubert,* 43 F.3d at 1317. This is the case because experts whose findings flow from their own research are less likely to be biased by the promise of monetary compensation for their testimony. *Id.* Moreover, because there are likely to be very few experts researching the specific subject that is at issue at trial, testimony by those experts provides a natural constraint on the parties' abilities to "shop for experts" who will support their desired interpretation of the evidence. *Id.*

If an expert does not testify based on independent research, the party offering such testimony must come forward with other "objective, verifiable evidence" that is based on "scientifically valid principles." *Id.* at 1318. "Peer review and publication are valid principles." *Id.* at 1318. Peer review and publication are the most important means of ensuring that an expert's methodology is sound. *Id.*

In this case, Plaintiffs presented two witnesses to testify about the supposed interaction between Penicillin–VK and Triphasil–28

birth control pills: Dr. Hinderstein, M.D.[2] and Dr. Harralson, Pharm.D.[3] Neither of these witnesses have done any independent research in the area of antibiotic/oral contraceptive interaction. Tr., vol. 2, at 223–224, vol. 4, at 620. Therefore, the Court's inquiry here is limited to whether each testified based upon objective, verifiable evidence that was derived from scientifically valid principles. In essence, the Court must determine whether the articles upon which the witnesses based their opinions are supported by good science.

▮ After carefully considering Dr. Hinderstein's and Dr. Harralson's testimony, and reviewing the articles upon which they purported to base their opinions, the Court finds that Plaintiffs' evidence of causation is insufficient to satisfy the *Daubert* standard. Plaintiffs' evidence shows, at most, that there is anecdotal support for the hypothesis that an unexplained interaction between certain antibiotics and oral contraceptives may reduce the effectiveness of the contraceptives. However, Plaintiffs' evidence falls far short of the proven, cause-and-effect relationship that is necessary to satisfy the *Daubert* standard.

Plaintiffs' witnesses did not cite to any competent scientific evidence to support their testimony. Although Drs. Hinderstein and Harralson claimed that their opinions were supported by numerous scientific articles,[4] a careful reading of these articles reveals that many of their authors came to different conclusions than Plaintiffs' witnesses did. In other words, Plaintiffs' witnesses took data from articles that found no statistically significant correlation between antibiotic use and increased failure of oral contraceptives, and used the data to reach a conclusion contrary to the articles' own authors. This tactic does not qualify as good science.

For example, Plaintiffs' witnesses relied heavily upon the Back article to support their testimony. This article contains the author's discussion of findings he made while studying 7 women who were taking oral contraceptives and ampicillin concurrently. At trial, Plaintiffs' experts testified that the Back study showed a drop in the effectiveness of the oral contraceptives in two of the seven women. Tr., vol. 1, at 75–76, vol. 4, at 646–47. However, this conclusion is in direct contradiction to the article itself which concludes with the sentence: "Ampicillin did not lower plasma oral contraceptive steroid concentrations in this study and we would suggest, based on this, that women taking oral contraceptive

**2.** Dr. Hinderstein is a board certified obstetrician-gynecologist. Tr., vol. 2, at 218. He does not have an advanced degree or sub-specialty in reproductive endocrinology or pharmacology. Tr., vol. 2, at 223. Dr. Hinderstein's testimony at trial was based solely upon published articles he read during the seven hours in which he did research in preparation for his testimony. Tr., vol. 3, at 355–56.

**3.** Dr. Harralson is a board certified pharmacologist who teaches at the School of Pharmacy of the University of the Pacific. He has a bachelors degree in chemistry, a Pharm.D, and a postdoctoral fellowship in Pharmokinetics. Tr., vol. 4, at 608–609.

**4.** These articles included: "Antibiotic Interference with Oral Contraceptives," 122 *Journal of the American Dental Association* 79 (1991); R. Bainton, "Interaction Between Antibiotic Therapy and Contraceptive Medicine," *Oral Surgery, Oral Medication and Oral Pathology*, May 1986, at 453–455; Michael L. Barnett, "Inhibition of Oral Contraceptive Effectiveness by Concurrent Antibiotic Administration," 56 *Journal of Periodontology* 19 (1984); George K.B. Sandor &

Kenneth F. Uffen, "Antibiotic Administration and Oral Contraceptive Failure: A Drug Interaction to Note," 10 *Journal of the Canadian Dental Association* 775 (October 1987); Timothy G. Donley & Richard F. Smith, "Reduced Oral Contraceptive Effectiveness with Current Antibiotic Use: A Protocol for Prescribing Antibiotics to Women of Childbearing Age," 11 *Compendium of Continuing Education in Dentistry* 392 (June 1990); Margaret J. Sparrow, "Pill Method Failures", *New Zealand Medical Journal*, February 1987, at 102; Gillian M. Shenfield & Judith M. Griffin, "Clinical Pharmacokinetics of Contraceptive Steroids," 20 *Clinical Pharmacokinetics* 15 (1991); D.J. Back, *et al.*, "The Effects of Ampicillin on Oral Contraceptive Steroids in Women," *British Journal of Clinical Pharmacology*, vol. 14, at 43–48 (1982); Chad I. Friedman, *et al.*, "The Effect of Ampicillin on Oral Contraceptive Effectiveness," 55 *Obstetrics & Gynecology* 1, at 33 (January 1980); J.V. Joshi, "A Study of Interaction of Low–Dose Combination Oral Contraceptives with Ampicillin and Metronidazole," 22 *Journal of Contraception* 643 (1980); Helena Trybuchowski, "Effect of Ampicillin on the Urinary Output of Steroidal Hormones in Pregnant and Non–Pregnant Women," *Clinica Chimica Acta*, vol. 45, at 9 (1973).

steroids do not need to take alternative contraceptive precautions when prescribed ampicillin." Back, *supra* note 4, at 47.[5]

Furthermore, the only articles that actually tend to support Plaintiffs' experts are not based on controlled, scientific studies of the topic. Instead, they are all anecdotal case reports, reviews of research done by other people, or studies lacking a control group. As such, they are not derived through the scientific method.

For example, in the Sparrow article, the author made a study of 163 women who became pregnant while using oral contraceptives. She found that 27 of the women had experienced previous pill failures, 81 were smokers, 29 had menstrual disturbances and 37 were on antibiotics. Notably, 59 women had none of the predisposing factors above.

5. Drs. Hinderstein and Harralson also erroneously relied upon the Joshi and Friedman articles.

 In the Joshi article, the researchers set up three groups of women, all of whom were using oral contraceptives. Six of these women were given ampicillin, ten were given another antibiotic called metronidazole and a control group of an additional ten was given nothing. None of the women on ampicillin ovulated, two women on metronidazole ovulated, and one woman in the control group ovulated. According to Plaintiffs' experts, this data demonstrates that antibiotics interfere with oral contraceptives. Tr. at 650–651. However, this testimony again runs contrary to the conclusion drawn by the author of the article which was that neither ampicillin or metronidazole affected contraceptive steroid levels. Joshi, *supra* note 4, at 651.

 In the Friedman article, the author studied 11 women on oral contraceptives who were given ampicillin. Two of the 11 women showed breakthrough bleeding during the study, which Plaintiffs' witnesses claimed is an indication of lack of oral contraceptive effectiveness. Tr., vol. 4, at 649–650. However, yet again this testimony conveniently ignores the concluding sentence of the article which states: "Most important, ampicillin appears unlikely to diminish the effectiveness of the oral contraceptive studied." Friedman, *supra* note 4, at 36.

6. Using Plaintiffs' fallacious method of arriving at causation, one might cite the Sparrow study as standing for the proposition that the most likely cause of Karyn's pregnancy was her half-a-pack-a-day smoking habit. Tr., vol. 1, 80–81. After all, the women Dr. Sparrow studied were more than twice as likely to be smokers than to be taking antibiotics (81 were smokers while only 37 were on antibiotics).

Sparrow, *supra* note 4, at 102–103. Plaintiffs' witnesses testified at trial that this study showed that antibiotics caused an increased likelihood of pill failure. Tr., vol. 2, at 238–242. This testimony is obviously not based on good science.[6] The study had no control group, and included no accounting for women who were on both oral contraceptives and antibiotics but who did not become pregnant.[7] At most, the study suggests that antibiotic use may be a risk factor for women using oral contraceptives. It does not, however, demonstrate a sufficient level of causation to be admissible on this issue at trial.[8]

Plaintiffs' reference to the package labelling for Triphasil–28 as proof of causation is not sufficient either. The label merely warns that certain antibiotics may "possibly" have an effect on oral contraceptive effectiveness.[9]

7. When discussing the results of her research, Sparrow herself comments that her evidence is "anecdotal," and that "[t]he lack of controls in this study, i.e. the number of women on various antibiotics who did not become pregnant, limits the interpretation of our results." Sparrow, *supra* note 4, at 105.

8. Drs. Harralson and Hinderstein also cited to the Swenson abstract and the Shenfield & Griffin article to support their theory of causation. However, neither of these articles even comes close to being a controlled scientific study of the subject.

 In Swenson, which is only an abstract and was never actually published as a full-fledged article, the author made a study of five women on oral contraceptives and either tetracycline or ampicillin. Swenson concluded that the measured excretion of estrogen in the women's urine declined when they were taking the antibiotics and oral contraceptives together as opposed to when they were taking only oral contraceptives.

 In Shenfield & Griffin, the authors studied only one woman who was on oral contraceptives and minocycline. They concluded that the woman's levels of estrogen were lower when she was on minocycline. Shenfield & Griffin, *supra* note 4, at 32.

 The extremely small size of these studies makes them statistically insignificant. Furthermore, neither of these articles determined whether the women studied actually ovulated, and neither accounted for the independent contraceptive effect of progestin, *see infra* section II.B.1.

9. The package label for Triphasil–28 states: "Certain drugs may interact with birth control pills to make them less effective in preventing pregnancy or cause an increase in breakthrough

This language is even less probative than the inconclusive studies upon which Plaintiffs' witnesses relied. Furthermore, the inclusion of a boilerplate warning on a drug package insert may reflect no more than an overly cautious response to possible liability, not scientific proof of causation.

In sum, Plaintiffs' witnesses did not rely on a single, controlled study that showed a statistically significant correlation between antibiotic use and decreased effectiveness of oral contraceptives. Consequently, the Court finds that Plaintiffs' evidence does not satisfy the first prong of the *Daubert* standard.

### B. *Relevancy*

█ Scientific evidence must also meet the "fit" requirement by having a valid scientific connection to the inquiry at issue in the case. *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2796; *Daubert,* 43 F.3d at 1320. The "fit" requirement pertains primarily to the relevance of the evidence under Fed.R.Evid. 402, but also recognizes the special dangers inherent in scientific expert testimony. *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2796; *Daubert,* 43 F.3d at 1321 n. 17. Such testimony " 'can be both powerful and quite misleading because of the difficulty in evaluating it.' " *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound: It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)). Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is "convinced that it speaks clearly and directly to an issue in dispute in the case." *Daubert,* 43 F.3d at 1321 n. 17.

█ Here, as mentioned previously, Plaintiffs' scientific evidence was proffered to show causation. Under California law, the plaintiff has the burden of proving causation to a reasonable medical probability based on competent medical testimony.[10] The plaintiff must show both: (1) general causation—that the defendant's conduct increased the likelihood of injury; and (2) specific causation—that the defendant's conduct was the probable, not merely a possible, cause of the injury. *Jones v. Ortho Pharmaceutical Corp.,* 163 Cal.App.3d 396, 402–03, 209 Cal.Rptr. 456, 460 (1985); *Daubert,* 43 F.3d at 1320.

### 1. *General Causation: Interaction between Penicillin–VK and Triphasil–28*

To show general causation, Plaintiffs were required to demonstrate that there is a scientifically validated interaction between Penicillin–VK and Triphasil–28 birth control pills that made it more likely that Karyn would become pregnant while taking both drugs than if she were merely taking birth control pills alone. Here, even if Plaintiffs evidence had survived the first prong of the *Daubert* standard, it still does not meet the fit requirement.

█ To the contrary, Plaintiffs' entire theory of causation is flawed. Plaintiffs' witnesses testified that antibiotics kill bacteria in the digestive system, thereby interfering with the mechanism by which oral contraceptives release estrogen into the woman's body. This lowering of estrogen levels supposedly reduces the contraceptive effect of the birth control pills and allows the woman to ovulate and become pregnant. Tr., vol. 2, at 243–48, vol. 4, at 643.

However, Triphasil–28 birth control pills have two components, estrogen and progestin. Each component has independent contraceptive effect.[11] The progestin component

---

bleeding. Such drugs include rifampin, drugs used for epilepsy such as barbiturates (for example, phenobarbital), and phenytoin (Dilantin is one brand of this drug), phenylbutazone (Butazolidin is one brand), and possibly certain antibiotics. You may need to use an additional method of contraception during any cycle in which you take drugs that can make oral contraceptives less effective."

**10.** Because Plaintiffs brought this action under the Federal Tort Claims Act, California state law

substantively governs. 28 U.S.C. § 1346(b); *Hines v. United States,* 60 F.3d 1442, 1448 (9th Cir.1995).

**11.** During their testimony, both Dr. Hinderstein and Dr. Harralson admitted that progestin has an independent contraceptive effect. In fact, there are several oral contraceptives on the market that contain only progestin. Tr., vol. 3, at 359, vol. 4, at 753.

is metabolized in a different way than the estrogen component, and Plaintiffs' experts presented no scientific evidence whatsoever demonstrating that antibiotics interfere with metabolization of progestin.[12] Therefore, even assuming that scientific evidence showed that antibiotics interfered with the estrogen component, the progestin component would still prevent pregnancy.

### 2. Specific Causation: Probable Cause of Karyn's Pregnancy

To show specific causation, Plaintiffs had to demonstrate that the interaction between Penicillin–VK and Triphasil–28 birth control pills was the probable, not merely a possible, cause of Karyn's pregnancy. Under *Daubert*, Plaintiffs could carry this burden if they could show that such an interaction occurs at more than double the rate of the known failure rate for oral contraceptives alone. 43 F.3d at 1320 ("plaintiffs must establish not just that their mothers' ingestion of Benedictin increased somewhat the likelihood of birth defects, but that it more than doubled it").

Here, Plaintiffs have utterly failed to present any competent testimony on this issue. As mentioned previously, none of the articles cited by Dr. Hinderstein or Dr. Harralson contain a controlled, broad-based study of the existence of an interaction between antibiotics and oral contraceptives, let alone the rate at which such an interaction occurs. Given that over 14 million women in the United States are currently using oral contraceptives, and an unknown number of them are prescribed antibiotics from time to time, Plaintiffs' reliance on studies involving only a handful of women is clearly not statistically defensible.[13]

### II. Plaintiffs' Case

 Liability for negligence under California law requires proof of the following elements: (1) a legal duty of care; (2) a breach of that duty; and (3) causation. *Ann M. v. Pacific Shopping Ctr.*, 6 Cal.4th 666, 673, 25 Cal.Rptr.2d 137, 141, 863 P.2d 207, 211 (1993). In this case, even if the Court had found that Plaintiffs' scientific evidence was sufficient under *Daubert* to proceed to the trier of fact, Plaintiffs have still failed to meet their burden of persuasion on: (1) duty of care—whether the Army doctors were required to warn Karyn that antibiotics might interfere with the effectiveness of her birth control pills; and (2) causation—whether Karyn became pregnant while she was taking the antibiotics.

### A. Legal Duty: Informed Consent

 Under California law, a physician has a duty "of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved." *Arato v. Avedon*, 5 Cal.4th 1172, 1183, 23 Cal.Rptr.2d 131, 138, 858 P.2d 598, 605 (1993) (en banc) (quoting *Cobbs v. Grant*, 8 Cal.3d 229, 242, 104 Cal. Rptr. 505, 514, 502 P.2d 1, 10 (1972)); *Hanna v. United States*, 845 F.Supp. 1390, 1392 (E.D.Cal.1993). This duty does not require the physician to conduct a "mini course in medical science" or to discuss "the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence." *Cobbs*, 8 Cal.3d at 244–45, 104 Cal.Rptr. at 515, 502 P.2d at 11; *See also, Arato*, 5 Cal.4th at 1186, 23 Cal.Rptr.2d at 139–140, 858 P.2d at 606–08. However, when recommending treatment, the physician must disclose any known risks of death or serious bodily injury and must explain in lay terms the complications that might possibly occur. The physician must also disclose "such additional information as a skilled practitioner of good standing would provide under similar

---

**12.** The only evidence that even hints at antibiotic interference with progestin levels is in the Trybuchowski article, where the author observed that one woman's progestin levels dropped while on ampicillin. Trybuchowski, *supra* note 4, at 9. However, this is clearly just an anecdotal observation, not the result of a broad-based, statistically valid study of the subject.

**13.** Nor did Plaintiffs establish the general background failure rate for oral contraceptives. The testimony on this issue was wholly inconclusive, ranging from a rate of less than 1 percent to more than 8 or 9 percent.

circumstances." *Arato,* 5 Cal.4th at 1190, 23 Cal.Rptr.2d at 143, 858 P.2d at 610.

■ Most often, determining whether a potential risk is material enough to require disclosure is a question of fact that does not necessitate the admission of expert testimony. However, in certain situations, expert testimony concerning the standard of care in the medical profession may help the trier of fact to determine whether a physician had a duty to disclose a potential risk. *Arato,* 5 Cal.4th at 1191, 23 Cal.Rptr.2d at 143–44, 858 P.2d at 610–11.

In this case, reference to expert testimony is appropriate to assist the Court, as the trier of fact, in determining whether a warning of the possible interaction between Penicillin–VK and Triphasil–28 was required. Such testimony is helpful to the Court in interpreting the complex and conflicting scientific evidence as to whether, and how often, such an interaction actually occurs.

■ At trial, both sides presented witnesses to testify whether the Army doctors were or were not required to warn Karyn that the penicillin they prescribed for her could interfere with the effectiveness of her birth control pills.[14] After considering this testimony, as well as the other evidence presented at trial, the Court finds that Plaintiffs have failed to carry their burden of establishing that a warning was required. As discussed in Section I.A, *supra,* the existence of a such a drug interaction is unproven and the danger of it occurring appears to be extremely remote. Consequently, the standard of care in Monterey County in early 1992 did not require a warning for this small risk inherent in the extremely common practice of prescribing antibiotics.

**B. Causation: Date of Conception**

Plaintiffs also failed to prove by a preponderance of the evidence that Karyn became pregnant during the time that she was taking Penicillin–VK. To the contrary, for several reasons, the Court finds that it is more likely than not that Karyn conceived before she began taking antibiotics.

■ First, at the time that Karyn's first pregnancy test was positive on February 19 at 9:57 a.m., it was too early for the test to sense conception that supposedly occurred on February 8 or 9. The timeline is as follows. After conception, the fertilized egg spends approximately 3 to 4 days in the fallopian tube. Then it moves into the endometrial cavity and spends an additional 3 to 4 days there. Then the egg implants in the uterus. Approximately one or two days following implantation, there is detectable human chorionic gonadotrophin ("HCG") in the woman's urine. For the next thirty-five days, the level of HCG doubles every 1.4 to 1.6 days. In other words, if the HCG level is one milli international unit of HCG eight days after conception, there would be 2 milli after approximately 9.5 days, 4 milli after 11 days and so on. Tr., vol. 8, at 30–35, 36–40.[15]

According to its labelling, the Icon II pregnancy test administered to Karyn was sensitive to 50 milli of HCG. However, defense

---

**14.** Plaintiffs called Dr. Hinderstein and a dentist, Dr. Grace, D.D.S. Dr. Hinderstein stated that he and the other members of the obstetrics/gynecology department of Silas B. Hayes Hospital had routinely made such warnings since at least early 1992. Tr., vol. 1, at 90. Dr. Grace stated that he had been giving such warnings in his practice since he read an article in the Journal of the American Dental Association in December 1991. Tr., vol. 1, at 157–58.

Defendant called Dr. Caples, D.D.S., head of the oral surgery unit at Silas B. Hayes Hospital, and Dr. Murphy, Karyn's obstetrician at Ft. Ord. Both stated that the policy of the Ft. Ord dental clinic was not to give such warnings in early 1992. Tr., vol. 1, at 171–72, vol. 5, at 830–835. Defendant's expert witnesses, Dr. Archer, Dr. Grimes, and Dr. Roy also stated their opinions that the scientific evidence of an interaction does not warrant a warning. Furthermore, Karyn herself admitted that during the 12 years she had been taking birth control pills no doctor had ever warned her about the possibility of an interaction with antibiotics. Tr., vol. 1, at 82–85.

**15.** The following chart summarizes the timeline:

| Event | Day |
|---|---|
| Ovum in Fallopian Tubes | 3 to 4 days |
| Ovum Implants in Uterus | 6 to 8 days |
| HCG Becomes Detectable | 7 to 10 days |
| 2 milli of HCG | 8.4 to 11.6 days |
| 4 milli of HCG | 9.8 to 13.2 days |
| 8 milli of HCG | 11.2 to 14.8 days |
| 16 milli of HCG | 12.6 to 16.4 days |
| 32 milli of HCG | 14 to 17 days |
| 64 milli of HCG | 15.4 to 18.6 days |

witness Dr. Roy admitted that in controlled laboratory trials the Icon II was able to detect levels of HCG as low as 20 milli. Tr., vol. 8, at 119. Either way, if Karyn conceived on the evening of February 8, the Icon II test could not have detected her pregnancy only 10.5 days later on the morning of February 19. As footnote 14 demonstrates, it takes at least 13 to 14 days after conception to arrive at 20 milli of HCG. If a pregnancy test administered on February 19 was positive, Karyn must have conceived, at the latest, on February 6 or 7. Conception on February 8 or 9 would not be detectable until February 21 or 22.

Second, it is highly improbable that Karyn would have been able to ovulate on February 8 or 9 if she had already taken six birth control pills on February 2 through 7. According to Dr. Archer's unrebutted testimony, the estrogen component of the Triphasil–28 pills would have inhibited Karyn's production of follicle stimulating hormone ("FSH") and luteinizing hormone ("LH") to such an extent during the first six days of her cycle that it would have prevented her follicles from enlarging sufficiently thereafter to produce an ovum on February 8 or 9. Tr., vol. 5, at 899–900. In other words, even assuming that the antibiotics interfered with the effectiveness of Karyn's birth control pills, there was not enough time after Karyn started taking the antibiotics to result in pregnancy within two days.[16]

### CONCLUSION

Based on the foregoing, the Court finds for Defendant and against Plaintiff. Judgment will be entered accordingly.

IT IS SO ORDERED.

16. At trial, the parties also spent much time and effort debating the significance of three ultrasounds taken of Karyn's fetus on April 30, June 10, and October 6. See Tr., vol. 2, at 293–334. In each of these ultrasounds, measurements were made of various parts of the fetus's body to determine its approximate age, and therefore the date of conception.

After examining these ultrasounds in detail, the Court finds them to be inconclusive in determining the date of Abbigayle's conception for several reasons: (1) the estimated date of conception had a margin of error of plus or minus 7 days; (2) it was unclear which of the ultrasound measurements was the most accurate; and (3) the parties' experts applied wholly incompatible methodologies as to whether the estimated date resulting from the ultrasound measurements was the conception date or merely the date of Karyn's last menstrual period.