UNITED PHOSPHORUS, LTD., Plaintiff,

v.

MIDLAND FUMIGANT, INC., Defendant.

UNITED PHOSPHORUS, LTD.,
et al., Plaintiffs,

v.

MIDLAND FUMIGANT, INC.,
et al., Defendants.

Civil Actions Nos. 91–2133–EEO, 95–2267–EEO.

United States District Court,
D. Kansas.

June 13, 1997.

---

8. *See* n. 7 *supra.*

Robert E. Marsh, Floyd R. Finch, Jr., Bruce Campbell, Kathryn B. Bussing, Shelley A. Runion, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, William F. High, James M. Warden, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, Michael G. Smith, Sprint Communications Co., L.P., Law Dept., Kansas City, MO, for United Phosphorus, Ltd.

John C. Tillotson, Murray, Tillotson & Nelson, Chtd., Leavenworth, KS, D.A.N. Chase, Chase & Yakimo, Overland Park, KS, Richard P. Stitt, Overland Park, KS, for Midland Fumigant Inc.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court on the following motions:

Plaintiffs' Motion in Limine to Preclude New Testimony and Related Exhibits at the *Daubert* Hearing on Hoyt (Doc. # 256);

Plaintiffs' Motion in Limine to Exclude Dr. Richard Hoyt's Testimony and Expert Report (Doc. # 218); and

Plaintiffs' Motion in Limine to Exclude the Testimony of Defendants' Expert Herbert S. Harrison at Trial (Doc. # 219).

For the reasons stated below, the motions are granted.

I. *Plaintiffs' Motion in Limine to Preclude New Testimony and Related Exhibits at the Daubert Hearing on Hoyt (Doc. # 256).*

Plaintiffs move, pursuant to Federal Rule of Civil Procedure 37(c)(1), for an order precluding defendants from offering testimony of Dr. Richard C. Hoyt beyond that contained in his expert report filed pursuant to Rule 26(a)(2)(B). In addition, plaintiffs move to preclude the defendants' use of any exhibits in addition to those attached to Dr. Hoyt's expert report, and to preclude reference to articles or other documentation not stated in Dr. Hoyt's report. At the *Daubert* hearing held on March 4, 1997, the court provisionally admitted defendants' Exhibits 400, 401, 402, 404, and 415, subject to plaintiffs' objection. The court stated that it would be in a better position to make an intelligent ruling after the close of the hearing.

Federal Rule of Civil Procedure 37(c)(1) provides, in pertinent part:

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Plaintiffs represent in their motion in limine that they were not provided with a copy of these additional exhibits until the exhibit marking session, less than one week before the *Daubert* hearing. Defendants do not dispute this factual contention, and have provided the court with no substantial justification for their belated attempt to admit these five additional exhibits.

Rule 26(a)(2)(B) requires the expert report to contain, *inter alia*, the "information considered by the witness in forming the opinions [and] any exhibits to be used as a summary of or support for the opinions ...." Defendants have never supplemented or modified Dr. Hoyt's report, as specifically prescribed under Rule 26(e)(1). Plaintiffs assert that these new exhibits prejudice them because the exhibits attempt to recast and restate Hoyt's opinion, which, if admitted at the *Daubert* hearing, would defeat the purpose of the disclosure requirements and would encourage "sandbagging."

The court, now aided with the full perspective and context of the hearing, agrees. The court finds that defendants have failed to comport with the requirements of Rule 26(e)(1), and have failed to demonstrate substantial justification under Rule 37(c)(1). Accordingly, plaintiffs' motion in limine is granted. The court will evaluate the *Daubert* inquiry on the basis of Hoyt's expert report as originally filed, and will consider only those exhibits attached thereto,

and Dr. Hoyt's testimony bearing thereon.[1] *See Nortex Drug Distributors, Inc. v. Drug Emporium, Inc.*, No. C-2-93-767, slip op. at 3-7 (S.D.Ohio 1997) (affirming magistrate judge's order excluding from trial Dr. Hoyt's amended report, and precluding Hoyt from testifying on matters not contained in his initial report, on grounds of untimeliness and prejudice to other party).

II. *Plaintiffs' Motion in Limine to Exclude Dr. Richard Hoyt's Testimony and Expert Report (Doc. # 218).*

Plaintiffs United Phosphorus, Ltd., and Inventa Corporation have moved, pursuant to Federal Rules of Evidence 104(a), 403, 702, and pursuant to the holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to preclude defendants' use at trial of the testimony and expert witness report of defendants' economic expert, Dr. Richard Hoyt. On March 4, 1997, the court held a *Daubert* hearing and heard the testimony of both Dr. Hoyt and plaintiffs' rebuttal witness, Dr. John J. Siegfried. The court has thoroughly reviewed the transcript of the hearing, the evidence and exhibits presented, and the expert reports of both Dr. Hoyt and Dr. Siegfried. The court finds that plaintiffs' motion should be sustained for the reasons stated below.

A. Factual Background.

The following facts were adduced at the hearing, and are essentially undisputed for purposes of this motion:

Aluminum phosphide is a fumigant, used for the control of insects in grain products and warehouses. It is sold in pellet and tablet form. Midland Fumigant, Inc. ("Midland") is a Kansas corporation, formed in 1987. At the hearing, plaintiffs' counsel read into the record certain portions of the deposition testimony of Don Fox, the president of Midland. Fox testified that he bought aluminum phosphide from Excel Industries ("Excel") in India, but that defendants "wanted to change the name to another name because of a bad connotation of poor quality product that the Indians produced." Fox testified that aluminum phosphide marketed under Excel's "L-Fume" label was "horrible stuff."

At the hearing, plaintiffs also presented excerpts from the depositions of Hugh Lynn, Midland's former national sales manager, and Charles Estes, Midland's current national sales manager. Hugh Lynn testified that L-Fume had the reputation that it was a poor quality product and could be dangerous. Lynn explained that the reason defendants wanted to relabel the L-Fume as Quick-Phos was because "the L-Fume label met an awful lot of resistance in the marketplace ... [b]ecause of the ... past history of poor quality product." Lynn confirmed that Midland wanted to overcome that resistance to the L-Fume label by using the Quick-Phos label, which did not meet resistance in the marketplace.

According to Charles Estes' deposition testimony, both he and Don Fox were aware that Midland was relabeling Excel's L-Fume product as Quick-Phos, and selling it to customers as Quick-Phos. Estes also testified that the L-Fume product had a dust and flashing problem[2] that hurt the market price for L-Fume, and that the L-Fume product had the worst dust and flashing problem in the industry in 1989. Estes further stated that Midland would not have relabeled over 2000 cases of L-Fume as Quick-Phos unless the value to Midland of relabeling the product exceeded the cost of relabeling.

In May of 1988, Midland ordered a container load of genuine Quick-Phos from United Phosphorus on consignment at $252 per

---

1. Out of an abundance of caution, the court has reviewed the several exhibits at issue, and determines that even if the court were to consider these exhibits and any related testimony, the evidence would not alter in any way the court's conclusion under *Daubert, infra*, that Dr. Hoyt should be precluded from testifying at the trial of this case.

2. According to Estes' deposition, "dusting" is a problem with the pelletization or tabletization of the aluminum phosphide product, where the pellets or tablets tend to "fall apart." "Flashing" is a problem that arises when the aluminum phosphide product is opened, and a flame shoots out or a minor explosion occurs. This is dangerous because the product is used in close proximity to grain, which is highly flammable.

case. Midland subsequently purchased and resold less than one-half of the Quick–Phos in a series of transactions in the summer and fall of 1988. In November and December of 1988, Midland received multiple containers of L–Fume from Excel, at $212 per case, and relabeled nearly all of it as Quick–Phos. In the fall of 1990, Midland began purchasing most of its aluminum phosphide from Lingyunggang Chemical Factory in China, and applied Quick–Phos labels to the product. In June of 1992, Midland continued to sell the Chinese aluminum phosphide product, but contends it switched from using the name Quick–Phos to using the name Fumi–Phos.

At the hearing, both sides presented evidence regarding the background and qualifications of their respective experts. Dr. Hoyt is president and sole shareholder of Analytics, Inc., an economic and statistical consulting firm. Hoyt described Analytics, Inc., as a business which provides services to the legal profession in the areas of antitrust, personal injury, wrongful death, contract, and securities litigation. Hoyt stated that Analytics, Inc., also provides class actions claims administration services and investment advisory services. According to Hoyt, thirty to forty percent of the revenues from the business are derived from forensic pursuits, and fifty percent from class action administration. Hoyt acknowledged that ninety percent of his firm's work is for lawyers or in the litigation context.

Hoyt received a B.S. degree in Milling Technology from Kansas State University in 1962, and a Ph.D. in Agriculture and Applied Economics from the University of Minnesota in 1972. Hoyt previously has held a teaching position at the William Mitchell College of Law in St. Paul, Minnesota, and has served as a guest lecturer at the University of Minnesota and at St. Olaf College. Hoyt has published a total of seven articles in his entire career, two of which appear in agricultural economics journals, and two of which were published in law reviews, and were therefore not subject to peer review by economists.

In contrast, Dr. John J. Siegfried is a professor of economics at Vanderbilt University, and has served as a professor there for 24 years. Siegfried earned a bachelor's degree in economics from Rensselaer Polytechnic Institute in 1967, a master of arts degree in economics from Penn State University in 1968, and a Ph.D. in economics in 1972. At Vanderbilt, Dr. Siegfried served as Chair of the Department of Economics from 1980 to 1986. He has taught numerous courses at Vanderbilt, including undergraduate and graduate courses on industrial organization and antitrust economics. He has held numerous visiting professorships throughout the world.

Siegfried's many honors include service as a Fulbright Senior Scholar (1991–92); service as president of the Southern Economic Association (1996); service as current secretary (executive director) of the American Economic Association (1997); and service on the senior staff of President Gerald Ford's Council of Economic Advisors. In 1990, the National Association of Economic Educators honored Siegfried with an award for lifetime contributions to research on economics education.

Siegfried has authored over 100 articles, which have been published in economics journals or as chapters in various books on economics. Siegfried currently serves on the editorial boards of three economics journals, and frequently "referees" articles submitted for publication to those and other economics journals. In that role, he opines whether an article is worthy for publication as a contribution to scientific knowledge in the field of economics.

Siegfried has previously testified as an expert in five to seven cases. Siegfried does not solicit consulting work and, in an average year, devotes only five to seven percent of his time to consulting in litigation.

At the hearing, defendants significantly narrowed the scope of Hoyt's expert report. Defendants clarified to the court that they now intend to rely only upon Hoyt's opinions contained in paragraphs 10(a) and (b), and paragraphs 12 through 17.[3] These portions of Hoyt's report state as follows:

---

**3.** Defendants have also withdrawn the final sentence to paragraph 17.

10. My specific opinions regarding Dr. Sullivan's Preliminary and Supplemental Reports are:

a. The Quick–Phos trademark had no economic value during the period immediately prior to the infringement;

b. Because the Quick–Phos trademark had no value prior to United's attempt at entry into the Unites [sic] States Aluminum Phosphide market, any alleged infringement of that trademark could not have diminished United's ability to enter the United States market. Consequently, deviations in prices and quantities from the levels hypothesized by Dr. Sullivan can not be attributed to the alleged infringement.

\*    \*    \*    \*    \*    \*

12. For a trademark to have economic value, the value must be gained through favorable consumer experience or heavy advertisement. In the case of a new product of unknown quality, investment in advertising or price discounting is required to gain trademark value. "The theory behind ... modern advertising is that once the name or trademark of a product is firmly associated in the mind of the buying public with some desired characteristic— quality, social status, etc.—the public will buy that product."[3]

13. Additionally, for a trademark to have value requires physical or psychological barriers that would prevent new firms from producing products that are close substitutes to those of major producers. An example of this is the cola soft drink market, in which the general public believes there are no true substitutes for Coke or Pepsi. In markets with homogeneous products, such as the aluminum phosphide market where there is no product differentiation, [4] trademarks are not necessary to signal quality, and therefore have little or no economic value. [5]

14. Prior to the alleged infringement, United's investment in the Quick–Phos trademark was minimal. [6] During the period from 1983 through 1988, Quick–Phos was marketed through the efforts of J.O. Hibbard, operating out of his house as Phos–Fume Chemical Co. Inc. As noted by Dr. Sullivan, Mr. Hibbard did not make an effective sales effort. Consequently, prior to 1989, no one made any significant investment in the Quick–Phos trademark. Based upon generally accepted economic theory, value does not begin to accrue to trademarks until after significant sales or advertising have been made. Therefore, Quick–Phos, as a trademark, had little or no value in the marketplace during the 1983 to 1988 time period.

15. Additional economic evidence for the lack of value for trademarks in the aluminum phosphide market comes from a comparison of the sales performance of Midland during and after the period it sold Quick–Phos. If, as assumed by Dr. Sullivan, trademarks (in this case, the Quick–Phos trademark) have value in the aluminum phosphide market, one would expect to find statistically significant changes in the level or growth of sales for Midland when the alleged infringement discontinued in May 1992. This hypothesis of structural change was tested using an F-test. [7] The results of this test, using generally accepted statistical methodology, is summarized in Exhibit B. The results of this test compel me to conclude that Dr. Sullivan's assumption, that the Quick–Phos trademark had value, cannot be supported. [8] These econometric results are consistent with aluminum phosphide being a homogenous product and purchasers having prior information regarding product quality. Both of these characteristics are present in the aluminum phosphide market.

16. If trademarks have significant value in the aluminum phosphide market, Degesch's trademark for Phostoxin, the established market leader, would be expected to have the greatest value. This hypothesis was also econometrically tested by examining the market reaction to Research Products switching from Degesch to Bernardo Chemical as their primary supplier after April 1991. If, as postulated by Dr. Sullivan, trademarks in the aluminum phosphide market have value, one would expect to find statistically significant changes in the level or growth of sales for Research between these two distinct periods. Since this

was not the case, this is further proof that Dr. Sullivan's contention, that trademarks in the aluminum phosphide market have value, is not valid.

17. Given the above conclusion, that the Quick–Phos trademark, both prior to and after the infringement, had little or no value in the United States aluminum phosphide market, the alleged inability of United to use the Quick–Phos trademark cannot be construed as having created a barrier to United's entry into the aluminum phosphide market. Consequently, United's inability to use the Quick–Phos trade name did not prevent United from entering the United States aluminum phosphide market and, therefore, had no impact on United's sales.

3. Horwitz, Lester and Ethan Horwitz, *Intellectual Property Counseling and Litigation*, Matthew Bender & Co. Inc., Volume 4, 1995, pp. 91—42 note 12.

4. *See* Donald Fox's deposition where he states "aluminum phosphide is a commodity like table salt," p. 40, 1. 21, and "aluminum phosphide is aluminum phosphide regardless of who makes it," p. 82, 1. 16. *See* Robert L. Hart's deposition, "phosphine is pretty much phosphine," p. 10, 1. 10.

5. *See generally*, Lane, W.J., "Compulsory Trademark Licensing," *Southern Economic Journal*, Vol. 54, No. 3, Jan. 1988, p. 643.

6. For example, the average annual advertising expense by Phos–Fume Chemical Co. Inc., for fiscal years 1985 through 1987 (ending February 28th) was $1,128.

Dr. Hoyt's Expert Report, pp. 6–11 (some parenthetical references and footnotes omitted).

### B. Daubert Standards.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), addressed the requirements of Rule 702, and emphasized that trial judges are required to act as gatekeepers to ensure that scientific expert testimony is both reliable and relevant. *Id.* at 597, 113 S.Ct. at 2798–99. In performing this "gatekeeping role," district judges are instructed to engage in a two-part analysis. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.) (on remand from *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469), *cert. denied*, — U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (hereinafter *"Daubert II "*). An expert's testimony must satisfy a standard of "evidentiary reliability" ("whether the [scientific] reasoning or methodology underlying the testimony is scientifically valid"), and a relevance requirement ("whether [the scientific] reasoning or methodology properly can be applied to the facts in issue.") *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796.

■ First, district courts must determine whether the proffered expert testimony consists of "scientific knowledge." The Supreme Court has interpreted the "scientific knowledge" requirement of Rule 702 as "establish[ing] a standard of evidentiary reliability" or "trustworthiness." *Daubert*, 509 U.S. at 590 & n. 9, 113 S.Ct. at 2795 & n. 9. Evidentiary reliability should be based upon "scientific validity." *Id.* An expert's "bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1315.

■ The Supreme Court in *Daubert* declined to set forth a definitive checklist or test for assessing whether a proffer of expert scientific testimony meets the validity, or reliability, requirements of Rule 702. *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796–97. The court, however, did list several factors judges may consider: (1) whether the theory or technique used by the expert can be, and

has been, tested; (2) whether the theory or technique has been subjected to peer review or publication;[4] (3) the degree of the method's or conclusion's acceptance within the relevant scientific community; and (4) in the case of a particular scientific technique, the known or potential rate of error. *Id.* at 593–94, 113 S.Ct. at 2796–97.

Courts have construed these factors as illustrative rather than exhaustive. In *Daubert II*, the court specifically noted an additional factor: whether the expert is proposing to testify about matters growing naturally and directly out of research conducted independent of the litigation, or whether the expert's opinion has been developed expressly for purposes of testifying. *Daubert II*, 43 F.3d at 1317. In noting this factor, the court reasoned:

> [I]n determining whether the proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.

> That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science. For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support ... That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions

he expresses were "derived by the scientific method."

*Id.* (footnote and citation omitted). The court further observed that if the proffered expert testimony is not based on independent research, the party must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles," *e.g.*, peer review and publication. *Id.* at 1318.

■ *Daubert II* suggests that the two principal ways for a proponent of expert scientific testimony to show that the proffered evidence satisfies the reliability prong of Rule 702 are to show: (1) that an expert's proffered testimony grows out of pre-litigation research, or (2) that the expert's research has been subjected to peer review. *Id.* Where such evidence is unavailable, *Daubert II* instructs that the proponent of the expert testimony may attempt to satisfy its burden through the testimony of its own experts. *Id.* at 1318–19. For such a showing to be sufficient, the experts

> must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

*Id.* at 1319.

Not all of the factors are equally applicable (or applicable at all) in a given case. *Id.* at 1316–17. Two of the four factors mentioned by the Supreme Court in *Daubert* seem nonapplicable to the expert testimony in the instant case. Dr. Hoyt appears to have examined certain literature, but has not performed any original research. As stated in *Daubert II*, "[a]s to such derivative analytical work, it makes little sense to ask whether the technique employed 'can be (and has been) tested,' *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2796, or what its 'known or potential rate of error' might be, *id.* at 594, 113 S.Ct. at 2797." *Id.* at 1317. *See also Lust v. Merrell Dow*

4. The court reasoned that "submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593, 113 S.Ct. at 2797.

*Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir.1996).

Moreover, an expert's conclusions must be supported by good grounds in each step of the analysis: *"Any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3rd Cir.1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). *See also Rutigliano v. Valley Business Forms*, 929 F.Supp. 779, 786 (D.N.J.1996) (citing *Paoli* ). Finally, in assessing the reliability prong, the court's focus must be solely on principles and methodology, not on the conclusions that they generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797–98.

Rule 702 also requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition is primarily a relevancy inquiry. *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2795–96.

We will now examine the reliability and relevancy prongs of the *Daubert* analysis in light of the testimony and other evidence presented at the hearing.

### C. Analysis.

#### 1. Reliability.

At the hearing, Siegfried testified regarding the economic validity of the conclusions contained in Hoyt's expert report. First, Siegfried addressed Hoyt's central thesis that the Quick–Phos trade name had no value in 1989 (paragraph 10(a) of Dr. Hoyt's report). Siegfried testified that Hoyt's report did not use a recognized economic methodology to establish the value of the Quick–Phos trade name in 1989, and did not consistently and logically apply accepted economic principles to the facts at issue. In support, Siegfried stated that Hoyt failed to apply the most common approach of an economist: in determining the value of something: to ask

whether anyone has paid something for it,[5] or whether anyone has ever incurred any cost to acquire it. He noted that certain facts of this case, ignored by Hoyt, presented several examples for determining value under this accepted approach.

As one example, Siegfried noted that in 1988, Midland purchased legitimate Quick–Phos for $252 a case, when an alternative, L–Fume, was available at $212 a case. Siegfried reasoned that Midland would not have purchased the Quick–Phos if it did not think the genuine Quick–Phos was worth the additional $40 per case. Otherwise, Midland would be making an irrational and non-profit-maximizing decision. He opined that Midland's own purchasing behavior provided a minimum estimate of the value of the Quick–Phos trademark. As a second example, Siegfried examined the facts surrounding Midland's act of pasting Quick–Phos labels onto L–Fume product. Siegfried concluded from this act that the Quick–Phos trade name had some value; otherwise, Midland would not have incurred the effort and expense to relabel over 40,000 flasks of L–Fume as Quick–Phos. According to Siegfried, the omission of these facts from Hoyt's expert report is inconsistent with scientific knowledge in the field of economics.

The court determines, based on the foregoing, that Hoyt violated a fundamental principle of economics when he failed to consider in his report the actions of Midland in estimating a value for the Quick–Phos trade name. Hoyt did not read any of the depositions (notably of Fox, Lynn, or Estes) before he rendered his report. Consequently, he was required to evaluate the Quick–Phos trademark with little knowledge about the facts of the case, and no knowledge about the underlying admissions from Midland's president and sales managers. The court finds that such ignorance of undisputed facts violates *Daubert's* requirement that an expert report and opinions must be based on "scientific knowledge."

---

**5.** Hoyt cannot contend that he is unfamiliar with the fundamental principle of economics that behavior in the real world is the best evidence of value. Indeed, Hoyt has written:

> To the economist, value is the amount that a firm or individual is willing to pay for some-

thing, *i.e.*, its market price. Measuring value this way is quite simple: a sales price is agreed to, a transaction takes place, and value is immediately determined.

Hoyt, "The Measurement of Value," J. of Legal Econ. 87 (July 1991).

Siegfried next testified regarding the methodology that Hoyt employed in arriving at the reasons, contained in paragraphs 12 through 16 of Hoyt's expert report, underlying Hoyt's conclusion that the Quick–Phos trade name had no value. In evaluating the methodology and use of economic principles in Hoyt's report, Siegfried reviewed the report for internal consistency and flaws in reasoning.

In paragraph twelve of Hoyt's expert report, Hoyt reasons that for a trademark to have value, "the value must be gained through favorable consumer experience or heavy advertisement," and that in the case of a new product, advertising or price discounting is required to gain trademark value. Hoyt contends in his report that because Quick–Phos had engaged in relatively little advertising, and because there had been little or no consumer experience with the Quick–Phos product, there can be no value to the trademark.

Siegfried testified that Hoyt's reasoning is flawed because, while advertising and consumer experience are certainly ways in which trademarks can obtain value, they are not the only ways. He noted that consumers can place a value on a trademark because they have heard of it through word of mouth, or have encountered the product through sales calls, sampling, and the development of personal relationships. As summarized by Siegfried,

> [t]he logical problem here is that if there are a series of ways, ... that a manufacturer can use to develop the value of a trademark and they are alternatives, just showing that a few of them, or two of them in this case, are not present is not sufficient logically for one to be able to deduce that the trademark is valueless. What you really have to do is go through every conceivable, every possible way to develop the value of the trademark and show that all of these different approaches are simultaneously not present.

Transcript of March 4, 1997, hearing, p. 51.

Siegfried pointed up an additional deficiency regarding Hoyt's advertising analysis, contained in paragraph fourteen of his report: Hoyt, in footnote 6 to his report, only referenced the average annual advertising expense by a single distributor company, Phos–Fume Chemical Company, Inc. His report did not take into account any marketing or advertising done by the manufacturer, United Phosphorus. Siegfried testified that it would be important to examine all sources of advertising, and that oftentimes, the manufacturer does most of the advertising. According to Siegfried, Hoyt's failure to examine all the sources of advertising resulted in a flawed methodology.

Siegfried also noted that Hoyt's advertising analysis failed to consider the nature of aluminum phosphide buyers. He stated that because aluminum phosphide is not a consumer product sold to the general public, but is a "highly distributed" product sold to sophisticated commercial buyers who have an incentive to closely examine the quality, price, and service of a product, any advertising is likely to be less important and less substantial in this context. Siegfried stated he saw no evidence that Hoyt considered the possible effects of United Phosphorus' international reputation with the name Quick–Phos.

In paragraph thirteen of his report, Hoyt reasons: "In markets with homogeneous products, such as the aluminum phosphide market where there is no product differentiation, trademarks are not necessary to signal quality, and therefore have little or no economic value.[4]" Siegfried disputes Hoyt's premise that aluminum phosphide is a homogeneous product, and contends Hoyt's conclusion flowing from that premise, that trademarks on aluminum phosphide have no value, is not consistent with accepted fundamental principals of economics.

Siegfried explained that in determining whether a product is homogeneous, an economist looks to consumers' behavior to determine whether consumers perceive different brands as the same product. If a product is truly homogeneous, consumers would be willing to pay only the price that is asked for by the lowest priced brand. With respect to the aluminum phosphide market, Siegfried reviewed the average price paid per case of aluminum phosphide sold by different manu-

facturers over a six-year period. He observed a distinct difference in the prices among the different manufacturers. He noted that the data reflected persistent price differentials among sophisticated commercial buyers, and reasoned that if the product of each manufacturer was identical, "one would have to be asking why six years later, the customers who are buying the high-priced product don't switch to the low-priced product if, in fact, they view it to be the same." Transcript of hearing, p. 62. He concluded that the six-year history of consumers' actual behavior suggested that "consumers do perceive there to be real and meaningful differences that they're willing to pay for among the different manufacturers of aluminum phosphide." *Id.*

Siegfried found the methodology contained in paragraph thirteen of Hoyt's report flawed in another respect: Hoyt relied on Don Fox for the premise that aluminum phosphide is a homogeneous product (footnote four of Hoyt's report, referencing excerpt of Fox's deposition). In Siegfried's opinion, it is not acceptable methodology for an economist to rely on deposition testimony of an interested party where objective evidence and analysis exists. Indeed, Siegfried noted that evidence of Fox's purchasing behavior with respect to aluminum phosphide belied Fox's assertion of homogeneity—Fox purchased legitimate Quick–Phos at $40 more per case than L–Fume, an act a profit-maximizing person would not do if he thought the Quick–Phos product was homogeneous with the L–Fume brand.

At the hearing, it appeared that Hoyt chose to abandon his reliance on the homogeneity conclusions in his report. On direct examination, Hoyt stated that homogeneity had nothing to do with his opinions. Such testimony flatly contradicted both the substance of his report and his previous deposition testimony, wherein he stated:

> My conclusion with respect to the trademark having little or no value is based in part on the limited amount of advertising,

> *it's based in part on the homogenous nature of the product, ...*

Hoyt Deposition, p. 65 (emphasis added). From the state of the record, it is somewhat unclear whether Hoyt currently intends to predicate his conclusion that the Quick–Phos trade name has no value upon paragraph thirteen of his report. To the extent that Hoyt does intend to rely on paragraph thirteen, however, the court finds that Hoyt's analysis is not consistent with generally accepted economic methodology.

In paragraph fifteen of Hoyt's report, Hoyt attempts to demonstrate that the trade name of Quick–Phos had no value in 1989 by comparing Midland's sales of Quick–Phos prior to May of 1992 (the date Midland claims it stopped selling product labeled Quick–Phos), to Midland's sales of Fumi–Phos after May of 1992. Hoyt tested his hypothesis with an "F-test," [6] a statistical test used to determine whether a relationship is the same at two different times, before and after some event.

Siegfried testified that use of an F-test to compare the sales trends in 1992 of Quick–Phos versus Fumi–Phos is not a proper methodology to establish the value of Quick–Phos in 1989. He explained that the flaw in Hoyt's methodology arises because Hoyt's analysis does not account for the fact that by 1992, the trademark infringement had been going on for approximately three years, and by that time customers would be aware that the product was not the quality of the original Quick–Phos product. Siegfried reasoned: "And so indeed even if you find or did establish that the benchmark trademark that you are comparing Quick–Phos in 1992 to was valued at zero, this would be no surprise. After the damage has been done, the value of the Quick–Phos trademark certainly would have been diminished." Transcript of hearing, p. 45. He characterized the real issue as the loss in value of the Quick–Phos trademark from 1989 to 1992, and stated that Dr. Hoyt's F-test does not address this comparison in any way.

Siegfried discerned another problem with Hoyt's methodology in comparing the sales

---

6. Defendants have abandoned Hoyt's second F-test, which serves as the basis for Hoyt's conclusions in paragraph sixteen. *See* transcript of hearing, p. 23. Accordingly, the court will not consider paragraph sixteen of Hoyt's report.

trend of Quick–Phos up to May 1992 with the sales trend of Fumi–Phos after May 1992. He stated that for the structural F-test to have some meaning, there has to be an identifiable event that separates the two different time periods. The event that Hoyt identified was Midland's switching from the Quick–Phos label to Fumi–Phos. Siegfried noted, however, that Hoyt's F-test ignored another significant event that occurred at exactly the same time and that would have affected sales: the exit from the market of Bernardo Chemical, one of the aluminum phosphide manufacturers, in April or May of 1992. Siegfried explained that when one manufacturer exits the market, an economist would expect the surviving firms to pick up some of the market share. Consequently, he reasoned that Hoyt's finding of no change in Midland's sales of aluminum phosphide at a time when one would expect sales to rise from the exit of Bernardo would suggest that even by Hoyt's own analysis, the value of the trademark at that time was falling.

Siegfried further noted that Hoyt had recognized as a "substantial market development" Bernardo's exit from the aluminum phosphide market in May 1992 in another portion of his report (page 14, paragraph 23 of Hoyt's expert report), but did not take this important variable into account in his interpretation of the F-test analysis in paragraph fifteen. Siegfried criticized this omission as a defect in Hoyt's methodology.

Another unexplained inconsistency in Hoyt's report is his conclusion in paragraph fifteen that the results of his F-test "are consistent with aluminum phosphide being a homogeneous product." At the hearing, Hoyt appeared to disavow any allegiance to the statements in his report that aluminum phosphorus was a homogeneous product.

Siegfried pointed out yet an additional deficiency in Hoyt's methodology. He noted that the basic logic of Hoyt's damages analysis is that if the Quick–Phos trademark is worthless in 1989, then United cannot recover any damages. Siegfried noted, however, that Hoyt had failed to account for the possibility that Quick–Phos' trade name could be reduced to less than zero. According to Siegfried, Quick–Phos' trade name could be reduced to less than zero by the acts of Midland in associating the Quick–Phos label with the inferior quality L–Fume product. Thus, United could be damaged even if its trade name in 1989 was worth zero, if United had to undertake the cost of abandoning the Quick–Phos name for another, unknown, trademark. Hoyt conceded that he had not addressed in his report the possibility that the L–Fume label had a negative value in 1989. Hoyt offers no scientific basis for ignoring this possibility; such omission does not comport with well-accepted scientific principles and methodology.

■ Hoyt acknowledged on cross-examination that he had never evaluated trademarks before. He further acknowledged that he developed the methodology in his expert report "on his own." His analysis regarding trademark valuation was done solely for use in litigation. That Hoyt's opinions were developed expressly for the purpose of testifying weighs against a finding that his opinions are "derived by the scientific method." *Daubert II*, 43 F.3d at 1317.

■ Where proffered expert testimony is not based on independent research, the party must come forward with other objective, verifiable evidence that the testimony is based on "scientifically, valid principles," *e.g.*, peer review and publication. *Id.* at 1318. Here, however, Hoyt concedes he has not published any article about the valuation of trademarks. Thus, his opinions and analysis regarding trademark valuation have not been subjected to the rigors of peer review. Moreover, at the hearing, Hoyt was unable to "point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that [he] had followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319. Indeed, Hoyt admitted that his report does not cite to a single economic treatise or article in which the author describes the proper way to evaluate a trademark. His report is simply devoid of any "objective, verifiable evidence" from which the court could conclude that the methodology Hoyt

created in this case is accepted by any other economist.

In sum, defendants have failed to demonstrate that the opinions of Hoyt are grounded in the scientific method. Hoyt has presented no evidence to satisfy the court that Siegfried's criticisms of his methodology are unfounded. Accordingly, Hoyt's proposed expert report and testimony fail to satisfy the "evidentiary reliability" standard as set forth in *Daubert*.

#### 2. Relevancy.

■ In light of our foregoing conclusion that Hoyt's testimony and report fail to satisfy the reliability prong of Rule 702, we need not discuss the second prong, *i.e*, whether there is a proper fit between the methodology used and the facts presented. *See Schmaltz v. Norfolk & Western Railway Co.*, 878 F.Supp. 1119, 1124 (N.D.Ill.1995) (citing *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1107 n. 20 (7th Cir.), *cert. denied*, 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994)).

Accordingly, plaintiff's motion in limine to exclude Dr. Hoyt's testimony and expert report is granted.

### III. *Plaintiffs' Motion in Limine to Exclude the Testimony of Defendants' Expert Herbert S. Harrison at Trial* (Doc. # 219).

Plaintiffs also move, pursuant to Federal Rules of Evidence 104(a), 403, 702, and pursuant to the holding in *Daubert*, to preclude defendant's expert, Herbert Harrison, from testifying in this case. At the March 4, 1997, hearing, the parties agreed to submit this motion on the briefs. The court is familiar with the standards governing admission of expert testimony, *see supra* at 681–83, and will not reiterate those standards here.

Plaintiffs contend that Harrison should not be permitted to testify in this case because: (1) Harrison's report and proposed testimony attempts to invade the province of the court by interpreting the law for the jury; (2) his opinions are not based on "scientific, technical, or other specialized knowledge," but instead is based on erroneous concepts of the

law and regulations; (3) the issues Harrison addresses are not relevant to the issues raised in the case and, therefore, his proposed testimony will not assist the trier of fact. In addition, plaintiffs assert that even if the proposed opinions were a proper subject for expert testimony, Harrison is not qualified to give such opinions, inasmuch as he is not a lawyer, chemist, or toxicologist.

■ Mr. Harrison is a former employee of the Environmental Protection Agency ("EPA") in Washington, D.C. Though Harrison was employed in various capacities in the Pesticide Registration Division, Office of Pesticide Programs of the EPA, the record reveals he did not have any responsibility for the registration of aluminum phosphide products during the years at issue in this case.

Harrison's report identifies three questions, which Harrison testified were drafted by defendants' counsel:

1. The question is presented whether Midland's placing of the Quick–Phos label, originally used or [sic] product manufactured by United Phosphorus of India, on a product manufactured by Excel Industries of India constituted misbranding under the provisions of FIFRA.

2. The question is whether Midland's confidential statement of formula filed with the EPA in April 1990 was misleading?

3. The question has been asked whether a competitor's chemical analyses as to aluminum phosphide active or inactive ingredients can demonstrate if the product of another company conforms to its own confidential statement of formula.

Harrison Report, pp. 1, 3, and 5. Following each question is a rambling commentary vaguely addressing the general topics of the questions, but which never precisely answer the questions. The court will now address plaintiffs' concerns with regard to the substance of Harrison's report.

It appears to plaintiffs, and to the court after a thorough review of Harrison's proposed expert report, that Harrison is attempting to invade the province of the court by interpreting the law for the jury. Harrison's proposed opinions concern whether the actions of Midland constituted misbranding

under certain provisions of FIFRA, and whether Midland's confidential statements of formula filed with the EPA were misleading. Harrison's opinion attempts to interpret the meaning and applicability of FIFRA, neither of which he is permitted to do as an expert.

Moreover, plaintiffs in their brief cite portions of Harrison's deposition testimony, where he concedes that he is not qualified to render legal opinions, but may only offer his admittedly tenuous understanding of the law. He also acknowledged that the EPA's Enforcement Division has previously advised him that his opinions in the past were "not: correct."

Federal Rule of Evidence 702 authorizes the court to admit expert testimony if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." When expert testimony embodies legal conclusions, however, it exceeds the permissible scope of opinion testimony. *See Frase v. Henry*, 444 F.2d 1228, 1231 (10th Cir.1971) (expert cannot state legal conclusions by applying law to the facts, passing upon weight or credibility of the evidence, or usurping the province of the jury by telling it what result should be reached); *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir.) (where former FAA official offered to testify about industry practice and FAA policy concerning application of FAA regulation, court excluded testimony on grounds that "meaning and applicability" of a specific law invades the province of the court to instruct the jury as to the law), *cert. denied*, 464 U.S. 895, 104 S.Ct. 243, 78 L.Ed.2d 232 (1983); *Marx & Co. Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir.) ("It is not for the witness to instruct the jury as to the applicable principles of law, but for the judge."), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). To the extent Harrison is purporting to give legal conclusions and opinions, such testimony is inadmissible.

Next, plaintiffs argue that Harrison's proposed testimony should be precluded because his opinions are not based on an adequate foundation of knowledge. Specifically, plaintiffs contend that Harrison wrote his report with very little knowledge about the underlying facts of the case. Harrison admitted that

his knowledge about the matters at issue in this case is limited to a small body of information provided to him by defendants' counsel. Additionally, plaintiffs point out that defendants' counsel first provided Harrison with information regarding the case on November 9, 1995, a mere five days before defendants' deadline for producing expert reports.

Plaintiffs have referred the court to numerous instances in Harrison's deposition testimony where he concedes he is unable to make an assessment based on the information provided to him. The court notes, as an example, the following deposition excerpt:

Q: [I]t is fair to say, isn't it, sir, that ... if the Excel product was not chemically identical to the United Phosphorus product, it is possible that those products would be misbranded, you just don't know based on the information you have; isn't that right, sir?

A: That's right, I just don't have the information—the information I have seen doesn't really assure one way or the other.

Harrison's Deposition, p. 51. "[T]he word 'knowledge' [in Fed.R.Evid. 702] connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. The court finds that the demonstrated lack of information makes it impossible for Harrison to testify with "scientific, technical, or other specialized knowledge" about the matters at issue in this case.

Plaintiffs also seek to preclude Harrison's opinions on the grounds that they are irrelevant to the trademark, unfair competition, RICO, and fraud issues in this case. Plaintiffs, in their reply brief, aptly point out that this issue of relevance is the sole issue defendants addressed in their scanty response. The court finds that defendants' response to this issue is inadequate, inasmuch as such response consists largely of an attempt to rewrite and recharacterize Harrison's opinions. Such reinterpreted opinions will not be considered by the court. Fed.R.Civ.P. 37(c)(1).

Finally, plaintiffs maintain that even if the substance of Harrison's report and proposed testimony were within the proper scope of

expert testimony, Harrison is not qualified to deliver those opinions. Harrison admitted in his deposition that he did not handle the day-to-day task of approving registrations. He also acknowledged that the Enforcement Division of the EPA had responsibility for "violation" issues, and that many of the issues in this case would be more properly addressed to a person who worked for that division of the EPA. He stated that he is not a lawyer, a chemist, or a toxicologist. The court finds that Harrison is not qualified to render the opinions contained within his report, or as recast by defendants' counsel's response brief.

IT IS THEREFORE ORDERED that plaintiffs' Motion in Limine to Preclude New Testimony and Related Exhibits at the Daubert Hearing on Hoyt (Doc. # 256) is granted.

IT IS FURTHER ORDERED that plaintiffs' Motion in Limine to Exclude Dr. Richard Hoyt's Testimony and Expert Report (Doc. # 218) is granted.

IT IS FURTHER ORDERED that plaintiffs' Motion in Limine to Exclude the Testimony of Defendants' Expert Herbert S. Harrison at Trial (Doc. # 219) is granted.