In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-00-481 CR


____________________



BRANDON LINN DUDLEY, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the Criminal District Court


Jefferson County, Texas


Trial Cause No. 80541






OPINION


 Beaumont police found Brandon Linn Dudley sitting in a car in possession of a
styrofoam cup. When police sniffed the contents of the cup the smell of cough syrup was
present. Laboratory testing later confirmed the presence of codeine in the liquid mixture
contained in the cup. Dudley was indicted for possession of codeine as listed under
Penalty Group 1 in the Health and Safety Code, in an amount of "four hundred (400)
grams and more." See Tex. Health & Safety Code Ann. § 481.115(a), (f) (Vernon
Supp. 2001). Prior to trial, the State moved to amend the indictment to charge Dudley
with the entirely separate offense of possession of codeine as listed under Penalty Group
4 of the Health and Safety Code, in an amount of "four hundred (400) grams and more." 
See Tex. Health & Safety Code Ann. § 481.118(a), (e) (Vernon Supp. 2001). 
However, the jury convicted Dudley of having committed the lesser included offense of
possession of codeine as listed in Penalty Group 4, in an amount of "200 grams or more
but less than 400 grams." 

 Dudley presents us with two appellate issues, the first of which complains of legally
insufficient evidence contained in the record to support his conviction. Specifically,
Dudley does not contest the sufficiency of the State's evidence regarding the quantity of
the codeine found in the liquid mixture contained in the styrofoam cup, but does contest
the legal sufficiency of the State's proof regarding the quality of the codeine found in the
liquid mixture, as defined in Penalty Group 4. In other words, as we appreciate Dudley's
appellate complaint, the definition of "codeine" as set out in Penalty Group 4, as opposed
to the definition of "codeine" as set out in any of the other penalty groups, IS the
controlled substance the State alleged he unlawfully possessed. As such, the State was
required to prove Dudley possessed codeine as specifically defined in Penalty Group 4,
because each penalty group set out in the Health and Safety Code contain entirely distinct
and separate lists of contraband, each with its own distinct chemical make-up. While two
or more penalty groups may include the same generic controlled substance, distinctions
arise, for penalty group purposes, when a controlled substance is defined in one penalty
group in its "pure" form, while defined in other penalty groups based upon certain other
distinct qualitative properties.

 As does the Court of Criminal Appeals, this Court is bound to accept the legislative
characterization or classification of prohibited substances regardless of how the scientific
community view them. See Few v. State, 588 S.W.2d 578, 583 (Tex. Crim. App. 1979). 
It has been observed that within the provisions of the Health and Safety Code, different
controlled substances are deemed to constitute varying degrees of harm to society in their
illicit uses, so differing punishments are authorized for the illicit use of the various
controlled substances. See Chalin v. State, 645 S.W.2d 265, 272 (Tex. Crim. App. 1982)
("When the Commissioner of Health classified phentermine by name within Schedule IV,
phentermine was determined to be less harmful than the general class of isomers of
methamphetamine listed in Schedule II.") In that light, the legislature apparently intended
to place codeine into three of the four penalty groups based upon particular qualitative
properties. Codeine's existence as a controlled substance is specifically defined in each
penalty group in which it appears as follows:

 Penalty Group 1: (2) the following opium derivatives, their salts, isomers,
and salts of isomers, unless specifically excepted, if the existence of these
salts, isomers, and salts of isomers is possible within the specific chemical
designation: . . . Codeine methylbromide; Codeine-N-Oxide; . . . . 

 (3) the following substances, however produced, except
those narcotic drugs listed in another group: Codeine not listed in Penalty
Group 3 or 4; . . . . (1) 


 Penalty Group 3: (4) a material, compound, mixture, or preparation
containing limited quantities of the following narcotic drugs, or any of their
salts: not more than 1.8 grams of codeine, or any if its salts, per 100
milliliters or not more than 90 milligrams per dosage unit, with an equal or
greater quantity of an isoquinoline alkaloid of opium;

 not more than 1.8 grams of codeine, or any of its salts,
per 100 milliliters or not more than 90 milligrams per dosage unit, with one
or more active, nonnarcotic ingredients in recognized therapeutic amounts;
. . . . (2) 


 Penalty Group 4: (1) a compound, mixture, or preparation containing limited
quantities of any of the following narcotic drugs that includes one or more
nonnarcotic active medicinal ingredients in sufficient proportion to confer on
the compound, mixture, or preparation valuable medicinal qualities other
than those possessed by the narcotic drug alone: not more than 200
milligrams of codeine per 100 milliliters or per 100 grams; . . . . (3)


 We agree, therefore, with the portion of appellant's argument that, having pleaded
possession of codeine "listed in Penalty Group 4 of the Texas Controlled Substances Act,"
the State was obligated to elicit evidence sufficient to prove Dudley's possession of codeine
as specifically defined under section 481.105(1), which defines Penalty Group 4 "codeine"
as, inter alia, a 200 milligram to 100 milliliter (or 100 gram) concentration ratio when
mixed with the required "nonnarcotic active medicinal ingredients." The question then
becomes whether the record reflects the State satisfied its burden to elicit legally sufficient
evidence of the required Penalty Group 4 concentration amounts. 

 In support of his position on this issue, Dudley points out that the State's laboratory
analyst, Charlyn Voight, testified that she did not specifically measure nor quantify the
concentration of codeine contained in the liquid submitted by the police for laboratory
analysis. However, we note the following testimony of Ms. Voight appears in the record:

 Q.(State) Ms. Voight, did you conduct a chemical analysis of the contents -
the liquid contents that was found in State's Exhibit Number 1, the styrofoam
cup with the lid and the straw?


 A.(Ms. Voight) Yes, I did.


 Q. Okay. What were the results of that analysis?


 A. That the liquid contained in the cup contained Codeine and one or more,
in this case, one other active medicinal ingredient. 


 Q. And, what was that?


 A. The other ingredient was Promethazine.


 Q. Okay.


 A. And this is a combination commonly found in cough syrup type
preparations that contain Codeine in a concentration of less than 200
milligrams per 100 milliliters of syrup. 


 In addition to the above testimony, Dudley introduced into evidence as Defendant's
Exhibit 1, the written laboratory report in which the identical evidence as to codeine
concentration was set out. In reviewing a record for legally sufficient evidence to support
the conviction, we view all the evidence in the light most favorable to the verdict in order
to determine whether any rational trier of fact could have found all of the essential
elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Santellan v. State, 939 S.W.2d 155, 160
(Tex. Crim. App. 1997). In a legal sufficiency analysis, we consider all the evidence,
whether properly or improperly admitted. Bobo v. State, 843 S.W.2d 572, 575-76 (Tex.
Crim. App. 1992); Chambers v. State, 805 S.W.2d 459, 460 (Tex. Crim. App. 1991). 
The record before us contains, as set out above, the testimony from Ms. Voight that the
codeine Dudley possessed was combined with another active medicinal ingredient,
promethazine. There was no objection to this testimony, nor to Ms. Voight's next
response that indicated the codeine/promethazine mixture was a combination typically
found in concentrations of 200 milligrams of codeine per 100 milliliters of syrup. (4) 
Additionally, Defendant's Exhibit 1, containing the same codeine concentration evidence,
was also before the jury. This is legally sufficient evidence for proof of the codeine
concentration as defined under Penalty Group 4 of the Health and Safety Code. 

 Finally, we take issue with the following statement contained in appellant's brief:
"Without testimony regarding the concentration, any possible ratio of mixture could be
inferred. To do so would not be to prove the codeine was listed in Penalty Group 4. It
is also listed in Penalty Group 1 and Penalty Group 3." This seems to imply that, so long
as the weight of the codeine is the same, proof of "concentration" alone was necessary in
order to eliminate the possibility of appellant's guilt under either Penalty Group 1 or
Penalty Group 3. (5) 

 This portion of Dudley's argument is misplaced because each penalty group defines
the qualitative presence of "codeine" either by (1) no use of "concentration" whatsoever,
or (2) by "concentration" in proportion to other substances that are explicitly not defined
as "one or more nonnarcotic active medicinal ingredients in sufficient proportion to confer
on the compound, mixture, or preparation valuable medicinal qualities other than those
possessed by the narcotic drug alone[.]" Indeed, in Penalty Groups 1, 3, and 4, the
descriptive language of the particular controlled substance containing "codeine" contains
distinctively different and concise wording. It is equally incorrect to say that a conviction
for Penalty Group 4 "codeine," (with its specific requirement that the "compound,
mixture, or preparation," be of such a quality that it possesses "medicinal qualities other
than those possessed by the narcotic drug alone") could somehow include a conviction for
Penalty Group 1 "codeine" ("Codeine methylbromide" or "Codeine-N-Oxide"). (6) At any
rate, we find the evidence legally sufficient with regard to the qualitative concentration of
codeine in relation to the other active nonnarcotic medicinal ingredient also proven. 
Dudley's first issue is overruled. (7) 

 Dudley's second issue contends that the trial court erred in overruling his objection
to the jury charge as given. Dudley was convicted under section 481.118(a) of the Texas
Health and Safety Code, which states, in pertinent part, as follows:

 [A] person commits an offense if the person knowingly or intentionally
possesses a controlled substance listed in Penalty Group 4, unless the person
obtained the substance directly from or under a valid prescription or order
of a practitioner acting in the course of practice.


Tex. Health & Safety Code § 481.118(a) (Vernon Supp. 2001) (emphasis added).

 In addition, section 481.062(3) of the Health and Safety Code states that someone
may possess a controlled substance if that person is "an ultimate user or a person in
possession of the controlled substance under a lawful order of a practitioner. . . ." Tex.
Health & Safety Code § 481.062(3) (Vernon Supp. 2001). At trial, the defense
objected to the application portion of the court's charge because it did not require the jury
to find that Dudley lacked a valid prescription for the codeine. The objection was
overruled. Now Dudley contends that this omission mandates reversal. We disagree. 
Section 481.184(a) of the Health and Safety Code states that:

 The State is not required to negate an exemption or exception provided by
this chapter in a complaint, information, indictment, or other pleading or in
any trial, hearing, or other proceeding under this chapter. A person claiming
the benefit of an exemption or exception has the burden of going forward
with the evidence with respect to the exemption or exception.


 Tex. Health & Safety Code Ann. § 481.184(a) (Vernon Supp. 2001) (emphasis added). 

 Therefore, a person claiming the benefit of the "ultimate user" exemption or
defense has the burden of producing evidence that raises the defense. Wright v. State, 981
S.W.2d 197, 200 (Tex. Crim. App. 1998). "Once the defense is raised, the trial court
must, if requested, instruct the jury that a reasonable doubt on the issue requires that the
defendant be acquitted." Id. A review of the trial record shows that Dudley offered no
evidence that he possessed the codeine by prescription. In fact, one of the arresting
officers was asked whether he had found a prescription for codeine in the car. He replied
that he had not. But he did indicate that he found a baby food jar with cough syrup residue
in the car, which in his experience was consistent with illicit, street level abuse of codeine. 
Since Dudley presented no evidence that he acquired the codeine by valid prescription, he
was not entitled to a jury instruction on the "ultimate user" exemption. Dudley's second
issue is overruled.

 Appellant's conviction and sentence are affirmed.

 AFFIRMED.


 _____________________________

 RONALD L. WALKER

 Chief Justice


Submitted on July 30, 2001

Opinion Delivered October 24, 2001

Publish


Before Walker, C.J., Burgess and Gaultney, JJ.




CONCURRING OPINION



 I concur. Appellant does not contest the State's proof that he possessed a controlled
substance, including adulterants or dilutants, with an aggregate weight of "200 grams or
more but less than 400 grams." See Tex. Health & Safety Code Ann. § 481.118
(Vernon Supp. 2001). The controlled substance's aggregate weight puts it squarely within
the second degree felony range of section 481.118(d). Appellant does not contest the
sufficiency of the State's proof that he possessed a "compound, mixture, or preparation"
containing codeine and "one or more nonnarcotic active medicinal ingredients in sufficient
portion to confer on the . . . mixture . . . valuable medicinal qualities other than those
possessed by the narcotic drug alone[.]" See Tex. Health & Safety Code Ann. §
481.105(1) (Vernon Supp. 2001). Rather, his point is that the concentration he possessed
may have exceeded Penalty Group 4's concentration requirement, and instead placed his
offense in Penalty Group 1 or 3. He does not contend that the concentration would have
resulted in a milder punishment, such as by making his conduct a misdemeanor rather than
a felony; the punishment classifications listed in section 481.118 are based upon the weight
of the controlled substance possessed, and he does not contest the aggregate weight of the
controlled substance he possessed. He makes the following argument in his brief. 

 Without testimony regarding the concentration, any possible ratio of mixture
could be inferred. To do so would not be to prove the codeine was listed in
Penalty Group 4. It is also listed in Penalty Group 1 and Penalty Group 3. 


In effect, appellant maintains the State had to show the actual level of codeine
concentration in order to establish that the substance he possessed fell within Penalty
Group 4 rather than a penalty group that requires a higher codeine concentration with
resulting greater punishment. Bottom line, his point on appeal is that he may have been
guilty of a greater offense than that for which he was convicted.

 Because I believe the evidence was sufficient as to his guilt of possession of codeine
in at least the concentration for which he was convicted, I concur in the affirmance of his
conviction and sentence.

 



 _________________________________

 DAVID B. GAULTNEY

 Justice


Concurrence Delivered

October 24, 2001

Publish



DISSENTING OPINION


 I respectfully dissent to the disposition of point of error one. While this is an
important case, it is a relatively simple one. Dudley attacks the legal sufficiency of the
evidence concerning the concentration of the codeine possessed. 

 Dudley was originally indicted for possession of penalty group 1 codeine, but the
State amended the indictment to allege possession of penalty group 4 codeine. The
application paragraph of the jury charge instructed the jury to consider if Dudley
"possessed a controlled substance listed in Penalty Group 4 of the Texas Controlled
Substance Act, namely, codeine . . . ." The failure to allege in the indictment the amount
involved or penalty group so as to reflect what punishment is involved, whether the offense
is a misdemeanor or felony, or whether a District Court has jurisdiction renders an
indictment fatally defective. Consequently, the State was required to plead within which
penalty group the substance fell and then prove it fell within the definition of penalty group
4. Benoit v. State, 561 S.W.2d 810, 815 (Tex. Crim. App. 1977); see also Kolbert v.
State, 590 S.W.2d 711, 712 (Tex. Crim. App. 1979). Thus, the question--did the State
prove it? The State concedes the only proof is the testimony from a chemist that the
substance taken from Dudley was "a combination commonly found in cough syrup type
preparations that contain codeine in a concentration of less than 200 milligrams per
milliliters of syrup," plus her testimony that codeine is listed in penalty group 4. The State
also concedes the chemist did not measure the concentration of the codeine. The State and
the majority contend this expert opinion evidence is sufficient. I disagree.

 The necessity to prove by chemical analysis that a material is illegal contraband
clearly is an essential element of the State's case. Aguilar v. State, 850 S.W.2d 640, 642 
(Tex. App.--San Antonio 1993), rev'd on other grounds, 887 S.W.2d 27 (Tex. Crim. App.
1994); see also Curtis v. State, 548 S.W.2d 57, 59 (Tex. Crim. App. 1977) (although an
experienced narcotics officer may identify marihuana, he may not testify that a powdered
substance is heroin). 

 An expert's opinion may be based upon sufficient relevant facts, but those facts
must be either within his personal knowledge, or assumed from common or judicial
knowledge, or established by evidence. Nejnaoui v. State, 44 S.W.3d 111, 118 (Tex.
App.--Houston [14th Dist.] 2001, pet. filed). Our Court of Criminal Appeals has spoken
several times recently on expert testimony and its value as evidence. In Jordan v. State,
928 S.W.2d 550, 554-55 (Tex. Crim. App. 1996)(footnote omitted), the court stated:

 While Rule 702 involves the dual inquiry of relevance and reliability,
the Supreme Court emphasized that the "overarching subject" of Rule 702
is the scientific validity of the evidence at issue. [Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, 593-95, 113 S.Ct. 2786, 2797]. In
sorting the untested or invalid theories from those that are grounded in
"good" science, trial judges are called upon to serve as "gatekeepers." Id.
509 U.S. at 595-99, 113 S.Ct. at 2798-99. With respect to the relevance
consideration, the Court pointed to Rule 702's requirement that the expert's
testimony "assist the trier of fact to understand the evidence or to determine
a fact in issue." Id. 509 U.S. at 589-93, 113 S.Ct. at 2795-96. Expert
testimony that does not relate to a fact in issue is not helpful. This
consideration is what the Supreme Court referred to as the "fit" requirement. 
That is, the proffered testimony must be "'sufficiently tied to the facts of the
case that it will aid the jury in resolving a factual dispute.'" Id. 509 U.S. at
591-93, 113 S.Ct. at 2796 (quoting United States v. Downing, 753 F.2d
1224, 1242 (3rd Cir.1985)).


 In line with this Court and the United States Supreme Court, the
Texas Supreme Court recently held that under Texas Rule of Civil Evidence
702, the proponent of expert testimony must show that it is relevant to the
issues in the case and is based on a reliable scientific foundation. E.I. du
Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549 (1995). The Court
emphasized the role of trial courts in scrutinizing "proffered evidence for its
scientific reliability when it is based upon novel scientific theories,
sometimes referred to as 'junk science.'" Id. at 554.


 The focus of the courts in Kelly, Daubert, and Robinson, was on
assessing the scientific reliability of the evidence at issue, rather than its
relevance. As discussed at length in those cases, reliability depends upon
whether the evidence has its basis in sound scientific methodology. This
demands a certain technical showing. Accordingly, it is upon the reliability
inquiry that trial courts can weed out testimony pertaining to so-called "junk
science." Id. It is largely to this end that trial judges are called upon to
serve as "gatekeepers." Daubert, supra. While "junk science" or otherwise
inadequately tested scientific theories might be shown to relate to the facts
of a case and to that extent be of assistance to the jury, it will not have a
sufficiently sound scientific basis to be reliable.


928 S.W.2d at 554-55.


 Later in Hartman v. State, 946 S.W.2d 60, 62-63 (Tex. Crim. App. 1997)(footnote 


omitted), the court said:


 Nowhere in Kelly did we limit the two-pronged standard to novel
scientific evidence. The Supreme Court in Daubert directly addressed the
issue in a footnote, stating "[a]lthough the Frye decision itself focused
exclusively on 'novel' scientific techniques, we do not read the requirements
of Rule 702 to apply specifically or exclusively to unconventional evidence."
Daubert, 509 U.S. at 593 n. 11, 113 S.Ct. at 2796 n. 11. The Supreme
Court noted that "under the Rules, the trial judge must ensure that any and
all scientific testimony or evidence admitted is not only relevant, but
reliable." Id. at 589, 113 S.Ct. at 2795 (emphasis added). We likewise see
no value in having a different standard of admissibility for novel scientific
evidence. The problems presented in determining whether or not a particular
type of evidence would be considered "novel" are daunting enough to reject
application of a dual standard. Moreover, we observe that the factors and
criteria set forth in Kelly as bearing upon the reliability of proffered
scientific evidence are adequate measure for assuring that "novel" scientific
evidence which is "junk science" is excluded. These factors "address the
soundness of the underlying scientific theory and technique." Jordan v.
State, 928 S.W.2d 550, 554 (Tex.Crim.App.1996). This is the linchpin of
Rule 702:


 [R]eliability depends upon whether the evidence has its basis
in sound scientific methodology. This demands a certain
technical showing. Accordingly, it is upon the reliability
inquiry that trial courts can weed out testimony pertaining to
so-called "junk science." Id. It is largely to this end that trial
judges are called upon to serve as "gatekeepers." Daubert,
supra. While "junk science" or otherwise inadequately tested
scientific theories might be shown to relate to the facts of a
case and to that extent be of assistance to the jury, it will not
have a sufficiently sound scientific basis to be reliable. 

 Id. at 555.


 The standard adopted by this Court in Kelly applies to all scientific
evidence offered under Rule 702. The court of appeals erred in applying a
standard different than that set forth in Kelly. . . .


946 S.W.2d at 62-63.

 The Courts have been consistent; there must be facts underlying the expert's opinion
or it is "no evidence." Simply because an expert says it . . . "don't make it so!" (8) It was,
in my view, necessary for the chemist to actually test the substance for its concentration. 
Since she admitted she did not do so, her opinion concerning the concentration equals "no
evidence." Therefore, the state did not prove the codeine possessed by Dudley was
penalty group 4 codeine and failed to prove an essential element of the indictment. 
Consequently, the evidence is legally insufficient and this court should reverse and acquit.
Gollihar v. State, 46 S.W.3d 243, 245 (Tex. Crim. App. 2001) (citing Greene v. Massey,
437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); Burks v. United States, 437 U.S. 1,
98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)).




 DON BURGESS

 Justice


Dissent Delivered

October 24, 2001

Publish
1. Tex. Health & Safety Code Ann. § 481.102(2) & (3)(A) (Vernon Supp. 2001).
2. Tex. Health & Safety Code Ann. § 481.104(a)(4) (Vernon Supp. 2001).
3. Tex. Health & Safety Code Ann. § 481.105(1) (Vernon Supp. 2001).
4. The dissent addresses the issue of the lack of scientific reliability of Voight's
testimony. However, we note that neither the reliability of her testimony nor her
qualifications as an expert are raised by any point of error in this appeal. While a brief
must state all issues or points presented for review; the statement of the issue will be
treated as covering every subsidiary question that is fairly included. See Tex. R. App. P.
38.1(e). "The brief must also contain a clear and concise argument for the contentions
made, with appropriate citations to authorities and to the record." Tex. R. App. P.
38.1(h). Here, there was no issue raised on appeal regarding the reliability of the
testimony or Ms. Voight's qualifications. Consequently, we do not address them. 
5. The concurrence takes the position that Dudley is essentially contending he is guilty
of a greater offense than that for which he was convicted. As we explain above, because
of his misplaced characterization of the penalty group distinctions of codeine as based
solely on "concentration," Dudley was actually never exposed to conviction for any
"codeine" offense in either Penalty Group 1 or Penalty Group 3. 
6. Nor are we on "safe footing" by making any sort of favorable comparison between
Penalty Group 4 "codeine," as specifically defined, with Penalty Group 3 "codeine,"
which includes codeine "or any of their salts: [in a particular grams per milliliter
concentration] or not more than 90 grams per dosage unit, with one or more active,
nonnarcotic ingredients in recognized therapeutic amounts[.]" Both penalty group
descriptions contain words of art from the scientific community that do not, at least on
their face, appear to have identical meanings. Nor is it a simple matter to say that proof
of codeine combined with another nonnarcotic active medicinal ingrediant, such as
Promethazine, but without an analysis done for specific concentration amounts
automatically places the codeine in Penalty Group 1 with its alternative description of
"Codeine not listed in Penalty Group 3 or 4[.]" Thankfully, these issues are not before
us in the instant appeal. 
7. For an interesting discussion encompassing the concepts of "adulterants and
dilutants," the "entity theory," and chemical "precursors," as involving weight or amount
of controlled substance present affecting legal sufficiency of the evidence, see Dowling v.
State, 885 S.W.2d 103 (Tex. Crim. App. 1992) ("original" opinion & opinion on
rehearing). 
8. Consider this language from Merrell Dow Pharmaceuticals, Inc. v. Havner, 953
S.W.2d 706, 712-13 (Tex. 1997)(footnote omitted):


 Justice Gonzalez, in writing for the Court, gave rather colorful
examples of unreliable scientific evidence in E.I. du Pont de Nemours & Co.
v. Robinson, 923 S.W.2d 549, 558 (Tex.1995), when he said that even an
expert with a degree should not be able to testify that the world is flat, that
the moon is made of green cheese, or that the Earth is the center of the solar
system. If for some reason such testimony were admitted in a trial without
objection, would a reviewing court be obliged to accept it as some evidence? 
 The answer is no. In concluding that this testimony is scientifically
unreliable and therefore no evidence, however, a court necessarily looks
beyond what the expert said. Reliability is determined by looking at
numerous factors including those set forth in Robinson and Daubert. The
testimony of an expert is generally opinion testimony. Whether it rises to
the level of evidence is determined under our rules of evidence, including
Rule 702, which requires courts to determine if the opinion testimony will
assist the jury in deciding a fact issue. While Rule 702 deals with the
admissibility of evidence, it offers substantive guidelines in determining if
the expert testimony is some evidence of probative value.


 Similarly, to say that the expert's testimony is some evidence under
our standard of review simply because the expert testified that the underlying
technique or methodology supporting his or her opinion is generally accepted
by the scientific community is putting the cart before the horse. As we said
in Robinson, an expert's bald assurance of validity is not enough. 923
S.W.2d at 559 (quoting Daubert v. Merrell Dow Pharms., Inc., 43 F.3d
1311, 1316 (9th Cir.) (on remand) (holding that expert's assertion of validity
is not enough; there must be objective, independent validation of the expert's
methodology), cert. denied, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126
(1995)).


 The view that courts should not look beyond an averment by the
expert that the data underlying his or her opinion are the type of data on
which experts reasonably rely has likewise been rejected by other courts. 
The underlying data should be independently evaluated in determining if the
opinion itself is reliable. . . .